IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| ABSOLUTE WASTE ACQUISITIONS, INC., | § | Case No. 05-22374 |
| | § | |
| DEBTOR | § | CHAPTER 11 |
| _____ | § | |
| THE OFFICIAL COMMITTEE OF | § | |
| UNSECURED CREDITORS OF | § | |
| ABSOLUTE WASTE ACQUSITIONS, INC., | § | |
| | § | |
| PLAINTIFF | § | ADVERSARY NO. 06-2010 |
| | § | |
| V. | § | |
| | § | |
| DANIEL E. STEPPE, Individually; | § | |
| NEW LIFE VENTURES I, LLC, a Texas | § | |
| Limited Liability Company; NEW LIFE | § | |
| VENTURES 401(K) PROFIT SHARING | § | |
| PLAN; GSW WASTE DISPOSAL | § | |
| INVESTORS, LP F/K/A ENERGY /REAL | § | |
| ESTATE RESEARCH, LLC, | § | |
| | § | |
| DEFENDANTS | § | |

**PLAINTIFF'S FIRST AMENDED ORIGINAL COMPLAINT**

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

COMES NOW, THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS of Absolute Waste Acquisitions, Inc. (the "Committee"), and file this Complaint against Daniel E. Steppe, Individually, New Life Ventures I, LLC, a Texas Limited Liability Company, New Life Ventures 401(k) Profit Sharing Plan, GSW Waste Disposal Investors, LP f/k/a Energy/Real Estate Research, LLC and in support thereof, would show the Court the following:

**I.  JURISDICTION, AUTHORITES, PARTIES**

1.   This Court has jurisdiction to hear this matter pursuant to 28 U.S.C. §1334, 28 U.S.C. §157, and the Standing Order of Reference of the United States Bankruptcy Court for the Southern District of Texas.  This is a core proceeding pursuant to 28 U.S.C. §157(b).

2.   Daniel E. Steppe is an individual and may be served with process at his place of business, New Life Ventures I, LLC, 255 Hedwig Road, Houston, Harris County, Texas 77024.

3. New Life Ventures I, LLC, is a Texas limited liability company, and may be served with process through its registered agent, Daniel E. Steppe, 255 Hedwig Road, Houston, Harris County, Texas 77024.  The Texas Secretary of State records indicate a tax-related forfeited existence of this entity on December 16, 2005.

4. New Life Ventures 401(k) Profit Sharing Plan is a Texas Trust and can be served with process by serving its Administrator, Daniel E. Steppe, 255 Hedwig Road, Houston, Harris County, Texas 77024.

5. GSW Waste Disposal Investors, LP f/k/a Energy/Real Estate Research, LLC is a shareholder of Absolute Waste Acquisitions, Inc. and can be served through its general partner Daniel E. Steppe, 255 Hedwig Road, Houston, Harris County, Texas 77024.

6. On November 8, 2005, Absolute Waste Acquisitions, Inc., ("Debtor" or "AWA") filed its voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code.  The Debtor is in possession of its property, except as hereinafter set forth and continues to operate its business as a Debtor-in-Possession.  No trustee or examiner has been appointed in this case.

## II.  OVERVIEW OF AWA

7. The Debtor is a corporation organized pursuant to the laws of the State of Texas on or about July 30, 2003, as the surviving entity in a merger.

8. The Debtor is in the business of providing solid waste collection services to cities, commercial businesses and residential customers in and surrounding Corpus Christi and Robstown, Texas. The Debtor has two locations (Robstown/Corpus Christi and San Antonio), 42 full-time employees and serves over 12,000 commercial and residential customers in this area.

9. The Debtor's financial difficulties stem from an unsuccessful attempt at becoming a public company.  The cost expended in the attempt to expand operations to a critical mass and the expenses associated with the failed public offering were a significant drain on the assets and cash flow of the company.  The failed public offering left the Debtor insolvent and unable to pay its debts as they came due, leaving the Debtor in need of additional capital to continue its business.

Randall Connally ("Connally") was contacted by the Debtor and offered to raise capital for it to work through its current financial situation.

10. In January 2004, Connally brought his longtime friend and business partner, Daniel E. Steppe ("Steppe") together with the Debtor, and negotiated on behalf of himself and Steppe. a $250,000.00 capital investment to be funded by New Life Ventures 401(k) Profit Sharing Plan ("NLV401"), controlled by Steppe. In this transaction, Steppe, individually, became a shareholder of the Debtor. Despite this cash infusion, the Debtor continued to default on its financial obligations and in mid-2004 the City of Corpus Christi was prepared to revoke the Debtor's permits to do business in the city. That action would have destroyed the ability of the Debtor to continue operating. Steppe and Connally again appeared. Steppe was appointed CEO of the Debtor on August 3, 2004, and took charge of the Debtor's business. With the promise of new competent management by him as CEO and Connally as President, and a promise to recapitalize the ailing Debtor, worked out a repayment agreement with the City of Corpus Christi allowing the Debtor to continue operations. On information and belief, those promises were made to other creditors and shareholders as well.

11. On August 5, 2004, a Restructuring Agreement, recognizing the financial extremus of the Debtor and its insolvency, was entered into between the existing equity owners and officers on one hand, and Steppe and Connally on the other. In that document, Steppe agreed to take on the responsibility of turning the Debtor around representing that he had both the knowledge and assets necessary to accomplish this task. The new capital infusion and new management offered by him and Connally convinced existing management that they were the white knights. An additional $250,000.00 capital was injected into the Debtor and the past $250,000.00 and $100,000.00 investment were restructured. Steppe was elected CEO and director, Connally was elected president and director. The two had put themselves into a position of direct and total control of the Debtor and in a position to become owners and its majority shareholders by options to acquire 2/3 of the Debtor's outstanding stock. Steppe and Connally were now in control of the day-to-day business as CEO and president and were the sole members of the Board of Directors. On three future

---

First Amended Complaint                                3

occasions, Steppe and Connally, through Steppe controlled entities, made capital infusions of $100,000.00, $100,000.00 and $165,000.00 on September 1, 2004, December 10, 2004 and April 15, 2005 respectively; each occasioned by an Investment Agreement.

12. Steppe as CEO and Connally as President, negotiated a discounted payoff by New Life Ventures I, LLC ("NLV1") of the first lien note held by First Capital Bank of Victoria (the "First Capital Note").  The note was bought and took assignment of an approximately $480,000.00 worth of the Debtor's secured debt previously owed on the First Capital Note on January 28, 2005, representing to the Debtor that the debt would be turned to capital.  As of January 27, 2005, the total payoff on the First Capital Note was $438,836.21.  First Capital Bank of Victoria was willing to offer a 20% reduction on the balance, allowing the Debtor to pay the note in full for $351,068.97.  This discount was negotiated by Connally as president of the Debtor.  On January 28, 2005, Connally caused the Debtor to issue a check for $82,068.97 to First Capital Bank of Victoria (the "Bank")  representing to the Debtor that this would be a required pay down of the note by the Bank and that Steppe would then buy the note and convert it to capital.  The $82,068.97 was instead given to Steppe; he added $269,000.00 and purchased the note.  It was assigned by the Bank to New Life Ventures 1, LLC ("NLV1"), a Steppe-owned and controlled entity.  The money was stolen.  The loss of the money resulted in most of the payroll checks of the Debtor being uncashable.

13. Steppe and Connally used the leverage that was gained by this purchase to further weaken the Debtor and consolidate their control not only over the Debtor but its assets as well. Steppe and Connally knew the Debtor was insolvent. Steppe and Connally knew that the Debtor was not paying its debts as they came due.  Steppe and Connally knew that loss of $82,068.97 caused the paychecks of the Debtor's employees to bounce.  With the full knowledge of the financial circumstances of the Debtor, Steppe and Connally, operating as officers and directors of the Debtor negotiated the note purchase to ensure that they and/or their entities would end up with all assets of the Debtor without any obligations to the then existing and future unsecured creditors. They anticipated rolling their entire investment into a fully secured first lien on all the assets of the

---

First Amended Complaint                  4

Debtor. They were getting a free ride. In furtherance of this scheme, Connally illegally caused assets of the Debtor to be directed to Steppe's control to aid in the note acquisition.

14. In addition, during this same time frame, Connally had secured an additional $300,000.00 in purported capital investment. He systematically paid back that $300,000.00 to the nominal investors, in violation of state law. Likely protecting friends or avoiding litigation against him and his co-worker.

15. Steppe and Connally failed in their promise to the Debtor and its creditors to reverse the financial situation of the Debtor through new management and recapitalization. The new management was in fact, a well-planned takeover of the Debtor by putting themselves or their entities in a first lien position for cents on the dollar and washing out all unsecureds. In fact, the Debtor was put in worse economic condition due to their actions. The actions and decisions made by Steppe and Connally during their period of total control of the Debtor increased the insolvency of the Debtor to the detriment of the creditors during a time when they were representing to those same creditors that they were improving the Debtor. They put money in only when they couldn't secure consessions from a creditor. That kept the Debtor operating so they could consolidate their hold on the assets of the Debtor, allowing them to own all the assets of the Debtor, including its contracts with its customers and future profit potential.

16. The Debtor generates approximately $400,000.00 a month in cash on its current contracts. But the future of this Debtor's business has a silver lining. The Debtor has an opportunity to acquire interest in a new landfill operation. This would substantially reduce the cost of disposal of the garbage that the Debtor currently picks up. That would substantially increase the profit margin on existing contracts and place the Debtor in a competitive advantage bidding on new contracts. This turnaround in the Debtor's fortunes would make the Debtor a very attractive takeover opportunity for the larger players in the industry, and potentially reap great rewards for the owners of the business. This is especially true if the owners had managed to write off approximately $2 million in unsecured debt.

17. The Debtor filed for Bankruptcy relief on November 8, 2005. The actions of Steppe and Connally over the 13 months they controlled the Debtor, had allowed marginal continued operations of the Debtor while it got deeper in debt, and they solidified their lien priority giving them the ability to own 100% of the assets of the Debtor without paying anything to the unsecured creditors. Debtor's assets were diverted for the benefit of both Steppe and Connally further worsening the position of the Debtor and all other creditors of the Debtor and forcing the bankruptcy filing.

18. On September 14, 2005, Steppe and Connally, to the benefit of entities used by them in this conspiracy, caused the Debtor to execute a Consolidation Note covering $860,000.00 of capital investments made by Steppe entities and a Security Agreement to grant a security interest in all the equipment and the bank accounts of the Debtor, knowing the Debtor did not owe the $860,000.00.

19. On September 14, 2005, Steppe and Connally caused the Debtor to execute a new Security Agreement pledging additional collateral on the previously purchased First Capital Note, forcing the Debtor to admit $530,000.00 was owed when everyone knew that was not correct, purported to limit the effects of 11 U.S.C. §§ 547 and 548 and give up other valuable rights.

20. On the same day, September 14, 2005, a newly secured First Capital Note was called and repossession of the collateral demanded. Steppe and Connally resign as CEO, president and sole board members and fill these positions with honorable people. But the trap was already tripped. On October 25, 2005, Steppe personally submitted to the U.S. Post Office in Corpus Christi a forwarding order effecting the forwarding of the Debtor's entire incoming post office box contents to his chosen address in Houston. This act was designed to weaken the ability of the Debtor to continue in business allowing the final takeover to occur. Steppe and Connally would get back most of their capital investment, they would own all the assets of the Debtor and the unsecured creditors would get nothing.

21. On October 31 and November 1, 2005, substantially all customers of the Debtor were instructed to divert all accounts receivable payment to a Steppe owned or controlled post office box. On November 8, 2005, the Debtor filed for bankruptcy protection.

### III.   CAUSES OF ACTION

A.   AVOIDANCE OF PREFERENCES—11 U.S.C. § 547

22. The Plaintiff hereby incorporates all the preceding paragraphs of the Complaint as if fully realleged herein.

23. Execution on September 14, 2005, of the Security Agreement on the First Capital Note granting a lien in additional property of the Debtor, giving up rights of the Debtor, placing restrictions on the Debtor and the Debtor's stipulation of an amount for in excess of what was owed by the Debtor were all transfers of property of the Debtor to a creditor, at a time when the debtor was insolvent, on account of antecedent debt.

24. Execution on September 14, 2005, of the Consolidated Replacement Promissory Note in favor of NLV1 and NLV 401(k) was a transfer of property of the Debtor to a creditor, at a time when the Debtor was insolvent, on account of an antecedent debt.

25. Each Transfer identified in paragraphs 24, 25 and 26 (the "Preferential Transfers") was directly to or for the benefit of a Defendant within the meaning of section 547(b)(1) of title 11 of the United States Code because the Preferential Transfers improved the position of the transferee.

26. Each Defendant was a creditor and an insider of the Debtor at the time of the Preferential Transfers within the meaning of section 101(10)(A) of title 11 of the United States Code. At the time of the Preferential Transfers, each Defendant had a right to payment on account of an obligation owed to the Defendant by the Debtor.

27. As of the date of the filing of the Complaint, no Defendant has returned any of the Preferential Transfers.

28. The Debtor was insolvent throughout the Preference Period within the meaning of the Bankruptcy Code, 11 U.S.C. §§ 101(32)(A) and 547(b)(3).

29. As a result of the Preferential Transfers, each Defendant received more than the Defendant would have received if: (i) the Debtor's case was a case under chapter 7 of title 11; (ii) the Preferential Transfers had not been made; and (iii) the Defendant received payment on the debt owed to it under the provisions of title 11.

30. Plaintiff is entitled to avoid the Preferential Transfers pursuant to section 547(b) of title 11 of the United States Code and preserve the transferred property for the Bankruptcy Estate.

B. **RECOVERY OF AVOIDED TRANSFERS—11 U.S.C. § 550**

31. As and for this paragraph of the Complaint, the Plaintiff hereby incorporates all the preceding paragraphs of the Complaint as if fully realleged herein.

32. To the extent that the Preferential Transfers are avoided as preferences under section 547 of title 11 of the United States Code, the Plaintiff is entitled to recover the Preferential Transfers from each Defendant or any immediate or mediate transferee of the Defendant under section 550(a)(1) of title 11 of the United States Code. The assets recovered will become the property of the Bankruptcy Estate.

C. **FRAUDULENT TRANSFER**

33. The Plaintiff hereby incorporates all the preceding paragraphs of the Complaint as if fully realleged herein.

34. From August 3, 2004, to November 1, 2005, Defendant Steppe was the CEO of the Defendant. Thus, Steppe qualifies as an insider for purposes of the Uniform Fraudulent Transfer Act and the United States Bankruptcy Code.

35. From August 3, 2004 to June 15, 2005, Connally was the President of the Debtor. Thus, Connally qualifies as an insider for purposes of the Uniform Fraudulent Transfer Act and the United States Bankruptcy Code.

36. From August 3, 2004 to November 1, 2005, there were various transfers of property ("Fraudulent Transfers") from the Debtor to Steppe and Connally in violation of the Uniform Fraudulent Transfer Act in that at the time of each transfer, the Debtor was indebted to Steppe and Connally or their controlled entities. At the same time, the sum of the Debtor's debts was greater

than the sum of its assets. Also, at the time of the transfer, both Steppe and Connally knew that the Debtor was insolvent, in that each of them had intimate knowledge of the Debtor's business affairs. Furthermore, Debtor made the Fraudulent Transfers for less than a reasonably equivalent value, and the fraudulent transfers were made with the actual intent to defraud and delay the creditors of the Debtor.

37. As a result of the Fraudulent Transfers, the Debtor has been damaged in an amount in an amount yet to be determined.

### D.     CONVERSION & EMBEZZLEMENT

38. The Plaintiff hereby incorporates all the preceding paragraphs of the Complaint as if fully realleged herein.

39. On one or more occasions, the Defendants unlawfully and without authority removed and retained Plaintiff's cash or caused Plaintiff's cash to be removed from various accounts, to the exclusion of and inconsistent with Plaintiff's rights in the cash and for the benefit of Steppe, Connally or their controlled entities.

### E.     BREACH OF FIDUCIARY DUTY

40. The Plaintiff hereby incorporates all the preceding paragraphs of the Complaint as if fully realleged herein.

41. During their tenures as officers of the Debtor, both Steppe and Connally negotiated multiple transactions with and for the Debtor. These negotiations culminated in various agreements between Steppe and the Debtor and/or Connally and the Debtor.

42. Plaintiff has now discovered that said transactions were not arms-length transactions. Rather, Steppe and Connally used their insider status and power to force the Debtor to take actions that were not in the Debtor's best interest, but that were in the best interest of Steppe and Connally.

### F.     CONSPIRACY TO BREACH FIDUCIARY DUTY

43. The Plaintiff hereby incorporates all the preceding paragraphs of the Complaint as if fully realleged herein.

44. Defendant Steppe and Connally combined to accomplish an unlawful purpose by unlawful means. Collectively and acting individually or by and through their controlled entities they used their corporate powers as officers and Directors of the Debtor to secure control of the assets of the Debtor and use or transfer those assets for the personal benefit of Steppe and Connally or of their controlled entities.

45. Both Steppe and Connally had knowledge of the common purpose of various agreements between the Debtor, Steppe and Connally and their controlled entities, namely to secure control of the assets of the Debtor and use or transfer those assets for the personal benefit of Steppe and Connally.

46. Both Steppe and Connally intended to combine their efforts in order to secure control of the Debtor and the assets of the Debtor and use or transfer those assets for the personal benefit of Steppe and Connally.

47. The Debtor was injured as a proximate result of the actions taken by Defendants Steppe and Connally.

48. Both Steppe and Connally acted maliciously, willfully, and fraudulently in their efforts to secure control of the assets of the Debtor and use or transfer those assets for their personal benefit of Steppe and Connally.

### G.   EQUITABLE SUBORDINATION

49. The Plaintiff hereby incorporates all the preceding paragraphs of the Complaint as if fully realleged herein.

50. The Plaintiff incorporates the allegations in paragraphs 1-46 here.

51. The Defendants took various actions for the purpose of securing control of the assets of the Debtor and in order to then use or transfer those assets for the personal benefit of Steppe and Connally and the controlled entities. The actions taken at a time that Steppe and Connally had absolute control over the Debtor. Steppe and Connally were the sole directors of the Debtor, its CEO and President, respectively.

52.     The creditors of the Debtor were injured as a proximate result of the actions taken by the Defendants.

53.     The actions taken by the Defendants conferred an unfair advantage on the Defendants.

54.     Under the provisions of section 510 of the Bankruptcy Code, the Court should equitably subordinate the claims of Defendants, if Defendants are found to have any claims at all, to the claims of the Plaintiff's represented class.

### H.     RE-CHARACTERIZATION OF DEBT AS EQUITY CONTRIBUTIONS

55.     The Plaintiff hereby incorporates all the preceding paragraphs of the Complaint as if fully realleged herein.

56.     Defendants own no legitimate claims in the Debtor's bankruptcy case. Rather, the Defendants own equity in the Debtor as a result of multiple capital infusions.

57.     "Whether a security constitutes equity or debt depends on the interpretation of the contract between the corporation and the security holders." *In re Color Tile, Inc.*, 2000 WL 152129, 2000 U.S. Dist. LEXIS 1303 (D.Del., February 9, 2000) (citing *Wolfensohn v. Madison Fund, Inc.*, 253 A.2d 72, 75 (Del.1969)). When interpreting the contract, the court should consider numerous factors, including: (1) the name of the instrument; (2) the parties' intent; (3) the presence of a fixed maturity date; (4) the right to enforce payment of principal and interest; (5) the presence or absence of voting rights; (6) the status of the contribution in relation to regular corporate contributors; and (7) certainty of payment in the event of the corporation's insolvency or liquidation. *In re Color Tile, Inc.*, 2000 WL 152129, *4, 2000 U.S. Dist. LEXIS 1303, *14 (D. Del., February 9, 2000). However, "where the same individuals control both the transferor and the transferee, the transaction must be scrutinized according to 'an objective test of economic reality' to determine its true economic nature." *Geftman v. Commissioner,* 154 F.3d 61, 75 (3d Cir. 1998).

58.     The Court should recharacterize the claims of the Defendants as equity contributions and subordinate the interests of the Defendants to the interests of the Plaintiff.

### I.     RACKETEER INFLUENCED & CORRUPT ORGANIZATIONS STATUTE

59. The Plaintiff hereby incorporates all the preceding paragraphs of the Complaint as if fully realleged herein.

60. This is a civil action brought by the Plaintiff under the Organized Crime Control Act of 1970, Racketeer Influenced and Corrupt Organizations, 18 U.S.C. § 1961 *et seq*.

61. The Plaintiff is a "person" within the meaning of 18 U.S.C. §§ 1961(3) and 1964(c).

62. Each defendant listed in the introductory paragraph of this Complaint is a "person" within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c) and (d).

63. New Life Ventures I, LLC; New Life Ventures 401(k) Profit Sharing Plan; GSW Waste Disposal Investors, LLC; and Energy/Real Estate Research, LLC (the "RICO Enterprises") are "enterprises" within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c).

64. Each defendant listed in the introductory paragraph of this Complaint was an owner of, was employed by, or was associated with one of more of the RICO Enterprises, each of which was engaged in and the activities of which affected interstate commerce, within the meaning of 18 U.S.C. § 1962(c).

65. Each defendant listed in the introductory paragraph of this Complaint conducted or participated, directly or indirectly, in the conduct of the RICO Enterprise's affairs, and conspired so to do, through a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5) on more than two occasions in the past five years, including but not limited to:

   a. Wire fraud in violation of 18 U.S.C. § 1341; and

   b. Alteration or falsification of documents presented to the U.S. Postal Service; and

   c. Transportation in interstate commerce of tangible goods taken or obtained by fraud in violation of 18 U.S.C. § 2314; and

   d. Mail fraud.

66. Both the Debtor and the creditors represented by the Plaintiff were injured by the Defendants in their business and property in an undetermined amount by reason of violations of 18 U.S.C. §§ 1962(c) and (d) committed by the aforesaid defendants within the meaning of 18 U.S.C.

§ 1964(c).

67. Moreover, the Defendants listed in the introductory paragraph of this Complaint were an association in fact, sharing a common purpose, unity, and identifiable structure in that they constituted a business group that permitted Defendants, including Steppe and Connally, to act in violation of the laws of the United States. The association in fact was thus an "enterprise" within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c).

68. Each defendant listed in paragraphs 2, 3, 4 and 5 was associated with the enterprise defined herein, the activities of which affected interstate commerce within the meaning of 18 U.S.C. § 1962(c).

**J.   NEGLIGENCE**

69. The Plaintiff hereby incorporates all the preceding paragraphs of the Complaint as if fully realleged herein.

70. This is a claim for negligence and gross negligence. Defendant Steppe, during his tenure as an officer and/or director of the Debtor, committed negligence and gross negligence by failing to use ordinary care in the management of the corporation's affairs.

71. Further, Steppe acted or failed to act with actual awareness that in doing so he would cause harm to the Debtor. As such, Steppe's acts were "malicious" as that term is defined in section 41.001(7) of the Texas Civil Practice and Remedies Code. TEX. CIV. PRAC. & REM. CODE § 41.001(7).

**K.   OBJECTION TO PROOFS OF CLAIMS**

72. The Plaintiff hereby incorporates all the preceding paragraphs of the Complaint as if fully realleged herein.

73. On March 14, 2006, New Life Ventures I, LLC filed a proof of claim in the subject bankruptcy case (Claim No. 48, attached as Exhibit A) and claimed it has a secured claim of $530,000.00.

74. On March 14, 2006, New Life Ventures I, LLC filed a proof of claim in the subject bankruptcy case (Claim No. 49, attached as Exhibit B) and claimed it has a secured claim of $830,000.00.

75. No money is owed on either claim and in fact both entities are, collectively, net debtors of the Debtor.

## PRAYER

Plaintiff requests that the Defendants be cited to appear and upon trial, a judgment be entered in favor of Plaintiff for:

1. all damages incurred by Plaintiff and Debtor caused by Defendants;

2. all obligations owed by the Debtor to the Defendants be subordinated to equity or determined to be equity contributions;

3. attorney's fees and costs incurred by Plaintiff and Debtor in prosecution of these matters;

4. pre-judgment interest and post-judgment interest; and

5. such other and further relief as is available at law or in equity.

Respectfully submitted,

/s/ Harlin C. Womble, Jr.
Shelby A. Jordan
State Bar No. 11016700
Admissions No. 2195
Harlin C. Womble, Jr.
State Bar No. 21880300
Admissions No. 8959
Jim Evans
State Bar No. 24040878
Admissions No. 37059
**Jordan, Hyden, Womble, Culbreth and Holzer, P.C.**
500 N. Shoreline Blvd., Suite 900
Corpus Christi, Texas 78471
Telephone: (361) 884-5678
Telecopier: (361) 888-5555
**ATTORNEYS FOR THE OFFICIAL COMMMITTEE OF UNSECURED CREDITORS OF ABSOLUTE WASTE ACQUISTIONS, INC., PLAINTIFF**

First Amended Complaint                14

## CERTIFICATE OF SERVICE

I, Harlin C. Womble, Jr., hereby certify that a true and accurate photocopy of the foregoing document was served via the ECF noticing system on the parties shown below on this 9th day of May, 2006.

John F. Higgins
Porter & Hedges, LLP
1000 Main Street
Houston, TX  77002
**Counsel for Defendants**

Patricia Constant
800 N. Shoreline Blvd., Suite 320S
Corpus Christi, TX  78401
**Counsel for Debtor**

                                                        */s/ Harlin C. Womble, Jr.*
                                                        Harlin C. Womble, Jr.